UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**H. EDWARD SNODGRASS,**

      **Plaintiff,**                                      **Case No. 2:04-cv-800**
                                                      **JUDGE GREGORY L. FROST**
      **v.**                                                  **Magistrate Judge Norah McCann King**

**UNUM LIFE INSURANCE**
**COMPANY OF AMERICA,**

      **Defendant.**

## OPINION AND ORDER

In this ERISA action, Plaintiff, Hiram Edward Snodgrass, appeals from the denial of his application for long-term disability benefits under a plan administered by Defendant, Unum Life Insurance Company of America ("Unum"). The parties have filed cross-motions for judgment on the administrative record, and briefing on those motions is now complete. (Docs. # # 17, 18, 19, 20.) For the reasons that follow, the Court **DENIES** Snodgrass' motion (Doc. # 17) and **GRANTS** Unum's motion (Doc. # 18).

### I.  Background

Plaintiff, Hiram Edward Snodgrass, was president and chief executive officer of the engineering and architectural firm Stults and Associates, Inc. when he was diagnosed with Parkinson's disease in 1997. After several years, Snodgrass elected to sell his firm. He completed the sale to Floyd Browne Associates, Inc. and left employment on July 17, 2000. Although Floyd Browne continued to pay Snodgrass $2,000 per month for 48 months as part of a consulting and non-competition agreement, it appears that Snodgrass did not perform work for

Floyd Browne.[1]

In 2001, Snodgrass contacted Floyd Browne regarding long term disability benefits. The administrative record does not contain the exact date of his inquiry, but a November 14, 2001 letter from Floyd Browne notes that Snodgrass' request for a disability claim form was "in early October" of 2001. (R. at 00568.) Citing several reasons why the company thought that such a benefit was not available to Snodgrass, Floyd Browne did not supply him with a form.

Snodgrass eventually obtained a form from Floyd Browne and submitted an April 17, 2003 claim for long term disability benefits; the record discloses that Unum received this application on June 20, 2003. (R. at 00081.) Snodgrass indicated on this form that he had been unable to work since December 15, 1999. (R. at 00398.) After reviewing the claim, Unum denied Snodgrass disability benefits in a September 30, 2003 letter. (R. at 00078-00083.) This letter discussed his medical history and indicated that Snodgrass had missed his filing deadline of July 18, 2001,[2] which meant that his claim was one year and eleven months beyond the deadline set forth in the disability contract,[3] and that Unum had determined that the delay prejudiced the company's ability to investigate Snodgrass' claim. (R. at 00081, 00079.)

---

[1] Unum's brief states that the parties agree that the monies constituted a portion of the purchase price paid under a monthly installment contract.

[2] This deadline is calculated from the last day that Snodgrass worked–July 17, 2000–as opposed to the earlier date on which he initially asserted he was disabled. In a March 14, 2004 letter, sent during the course of pursuing his claim with Unum, Snodgrass conceded, "I can accept July 17, 2000 as the date I was unable to perform the substantial duties required of me in my position as President of my company." (R. at 00054.)

[3] The disability insurance policy required notification and proof of a claim within 90 days after the end of the elimination period, but extended that period for an additional year if such proof were impossible within the 90-day period. (R. at 00375.)

Following the denial, Snodgrass filed an appeal with Unum in January 2004. (R. at 00053.)  After some correspondence regarding supplementation of Snodgrass' medical records, he declined to submit additional records and requested that Unum proceed with his appeal. (R. at 00054-00055.)  The company's medical department reviewed Snodgrass' medical records (R. at 00137-00144), and Unum subsequently denied his appeal in an April 14, 2004 letter. (R. at 00013-00019.)  The company again cited its conclusions that "the available medical information did not support impairment from performing your occupation as of your last day worked" and "due to the late filing of your claim, we were prejudiced in our ability to investigate your claim." (R. at 00016.)

Snodgrass subsequently filed the instant action on August 24, 2004.  (Doc. # 1.)  He asserts one cause of action under 29 U.S.C. § 1132(a)(1)(B) and seeks a judgment for short- and long-term disability benefits, plus interest, attorney's fees, and costs.[4]  After an inexplicable delay in which counsel for *both* sides failed to file their dispositive motions, the parties obtained leave of Court and filed simultaneous motions for judgment on the administrative record (Docs. # 17, 18) and subsequent responses (Docs. # 19, 20).  The matter is now ripe for adjudication.

## II.  Analysis

### A.  Standard Involved

Snodgrass asserts a single claim under 29 U.S.C. § 1132(a)(1)(B), which "gives a participant the right to bring a civil action 'to recover benefits due to him under the terms of his

---

[4] Snodgrass has made clear that although a life insurance policy exists, only "[t]he short-term and long-term disability benefits are at issue in this case.  The life insurance benefits are not." (Doc. # 19, at 12 n.7.)

3

plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.' " *Creech v. Unum Life Ins. Co. of N. Am.*, No. 05-5074, 2006 WL 41186, at *2 (6th Cir. Jan. 9, 2006). It is well settled that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 505-06 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). *See also Calvert v. Firstar Finance. Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005). If the plan provides the administrator with discretion, then "the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998). *See also Calvert*, 409 F.3d at 291-92.

Both sides agree that the arbitrary and capricious standard applies in the instant case. (Doc. # 18, at 11-12; Doc. # 19, at 4.) The Sixth Circuit has explained that, in determining whether this standard applies, a court should remain cognizant that a plan is not required to use certain magic words to create discretionary authority for a plan administrator in administering the plan. *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572 at n.2 (6th Cir. 1992). What is required is "a clear grant of discretion [to the administrator]." *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994). Because the plans involved here provide that "[w]hen making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy" (R. at 00369), the Court agrees with the parties that the arbitrary and capricious standard

applies.⁵ *See Evans v. Unumprovident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (construing identical language and concluding that "[t]he plan at issue clearly and unambiguously grants discretionary authority to defendant in its administration of the plan and determination of claims for benefits").

This standard "does not require [the Court] merely to rubber stamp the administrator's decision." *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). Rather, under the arbitrary and capricious standard, a plan administrator's decision will not be deemed arbitrary and capricious so long as "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (noting that "the arbitrary and capricious standard is the least demanding form of judicial review"). A court must therefore "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Jones*, 385 F.3d at 661. In other words, the Court will uphold a benefit determination if it is "rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). *See also Calvert*, 409 F.3d at 292.

In evaluating the record, then, the Court is required to consider only the facts known to the plan administrator at the time the final decision was made to deny disability benefits. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005); *see also Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991). The Court is also required to remain cognizant of

---

⁵ As Unum notes in its briefing, other policy provisions also reflect Unum's discretionary authority. (Doc. # 18, at 12-13.)

the potential inherent conflict of interest that arises when an insurer such as that Unum acts as both the decision maker on a claim and the potential payor of that claim. *Calvert*, 409 F.3d at 292. With these concerns in mind, the Court shall turn to the merits of the record.

### B. Discussion

There is no question that Snodgrass was late in filing his disability claim. He points to Floyd Browne for the delay, but the disability policy provides that although "[t]he claim form is available from your Employer ... you can request a claim form from us. If you do not receive the form from UNUM within 15 days of your request, send UNUM written proof of claim without waiting for the form." (R. at 00375.) It is unclear at what point Snodgrass learned of this provision; the record reflects that Snodgrass had requested a copy of the long term disability policy four times. (R. at 00203.) Unum eventually provided a copy of the policy and apologized for the delay. (R. at 00085.)

In any event, Snodgrass' claim was late. The issue is whether his lateness should be excused or whether Unum suffered prejudice so as to defeat Snodgrass' attempt at equitable tolling. Unum based its denial of Snodgrass' claim on the fact that it was allegedly prejudiced by the late filing of his disability claim. The company explained in its denial letter:

> If this claim had been submitted in a timely manner for review, a call to the attending physician would have been made to determine if there was treatment between these dates and medical records would have been requested. In addition, a call to you or a field visit would have been initiated to discuss your activities of daily living and how the diagnosis and symptoms of Parkinson's Disease were impacting your level of functional capacity.

(R. at 00079-00080.)[6]  The letter does not explain *specifically* how Snodgrass' late application prevented Unum from calling to check existing records of past treatment, how it prevented a successful request for records of prior medical treatment, or how it prevented the company from discussing with Snodgrass in September 2003 how his condition had previously affected his daily functioning.  In other words, Unum offered no explanation for its self-serving conclusions.  Notably, the company did *not* assert that the delay prevented a contemporaneous, independent medical exam, despite having previously noted in an August 15, 2003 letter that this could constitute prejudice.[7]  (R. at 00088.)

That said, the issue of prejudice is moot in light of the fact that the medical evidence does

---

[6] The reference to "these dates" apparently targets a preceding paragraph that discusses the period from February 5, 1999 to January 29, 2002.  (R. at 00080.)

[7] It is unclear whether Unum similarly declined to cite this as a reason for denying benefits in its April 14, 2004 letter denying Snodgrass appeal.  The use of "if" in line two of paragraph four on page four of that letter indicates that the company was not setting forth conclusions in that paragraph, but potential avenues of prejudice. (R. at 00016.)  In a later convoluted sentence on page five, the company notes that the late filing affected "a formal assessment of your functional ability and/or cognitive function or observation of your capacity demonstrated in the performance of daily activities," but is unclear whether Unum meant an assessment by Snodgrass' doctors or an independent examination.  Snodgrass has construed that sentence to mean that Unum asserts that "it would have arranged for a formal assessment of [his] functional capacity had the claim been timely filed." (Doc. # 17, at 7.)

Curiously, Snodgrass himself makes an issue of the lack of an independent medical examination.  In an effort to bolster his argument, he argues that Unum failed to send him for such an examination.  (Doc. # 19, at 6.)  But what this argument overlooks is that Unum *could not have* sent Snodgrass for an independent medical examination contemporaneous to his asserted date of disability, because Unum did not receive notice of his claim of disability until well after that date had long passed.  Regardless of who caused that situation–Snodgrass by submitting a late claim or Unum by failing to provide a claim application or copy of its policy–Unum's failure to act when there was no known cause to act hardly constitutes the sort of damning lapse that Snodgrass asserts.

not support Snodgrass' claim.[8]  Assuming *arguendo* that the Court were to excuse his lateness, an issue that ultimately need not be resolved, the record on the merits nonetheless fails to support that Unum's actions were arbitrary and capricious.[9]

This is because Unum's alternative ground for denying benefits is well taken.  In addition to asserting lateness and prejudice as justification for the denial, Unum also discussed the merits of Snodgrass' medical condition in its September 30, 2003 denial letter.  Addressing Snodgrass, the company summarized his medical history:

> You stated that your last day worked was July 18, 2000 due to Parkinson's Disease.  Medical records provided indicate that you were under the care of Dr. Hubble (Neurologist) for this condition surrounding the date of loss.  You were first diagnosed with Parkinson's Disease in 1997 when you first noted a slight tremor of your left hand and minimal tremor of your right hand.  The records provided indicate that you saw Dr. Hubble on February 5, 1999, where it is documented that you had more left hand tremor, and decreased arm swing, however there was no change in the quality of living or activities of daily living.  It was noted that you had decreased writing, but this was not further described.  It is noteworthy, that at this office visit, you stated that you had planned to sell your business in two (2) years.  Parkinson's Disease was documented as mild and it was noted as not disabling.  The plan was to follow up in 3 months.  The next office visit note is dated January 29, 2002.  At this office visit, it is documented that you were overall better with Sinemet CR.  It is also noted that you reported that fatigue and anxiety increased your tremor.  Moderate tremor was noted in the right leg.  Sinemet was increased from three times per day, to four times per day.
>
> In a letter of advocacy from Dr. Hubble, it was opined that you were working while impaired.  It was opined in the letter dated February 4, 2003, that based upon medical history and subsequent medical findings, he would determine that the date of disability would be December 15, 1999.  It is unclear from the medical

---

[8] The sub-issue of whether Floyd Browne functioned as or was an agent of Unum is therefore moot as well.

[9] The Court also assumes for the sake of argument that Snodgrass was potentially entitled to coverage despite his status as a consultant, a disputed issue on which the Court ultimately need not and does not opine.

8

> [records] provided, how Dr. Hubble would determine December 15, 1999 to be your date of disability, as you were seen on February 5, 1999 and then not again until January 29, 2002.  Nevertheless, since you continued to work full time after December 15, 1999, you did not meet the definitions of disability as stated in all of your policies.
>
> Medical records from Dr. Lahue dated September 23, 1999, make reference to you being part of a double-blind study but these records from the study were not included in the file for review.  It was noted on January 29, 2002 that the study was completed.

(R. at 00080-00081.)  The September 30, 2003 letter noted that "[y]ou were also under the care of Dr. Lahue and were seen on November 4, 1999 for your annual physical exam" at which "[i]t was noted that you had mild Parkinson's Disease."  (R. at 00080.)  Unum continued:

> The next medical note from Dr. Lahue is dated October 30, 2000.  This is three (3) months post your stated date of loss.  In this record, it is documented that you had progressive Parkinson's Disease and presented for physical exam.  Your gait was noted to be slower and your tremor was noted to be slightly more prominent.  Physical exam documented no numbness, weakness or incoordination.  An office visit on October 19, 2001 indicated that you had your Sinemet increased from three times per day to four times per day, your Parkinson's Disease was documented as stable, but gradually progressive, resting tremor was noted in both hands and you were walking with a slow gait.  Strength is noted to be 5/5.  Follow up was given for one year.  At this office visit, it was documented that you discussed the possibility of filing for disability and Dr, Lahue commented that he felt this was appropriate.  This was 15 months post the sale of your business and 15 months post your last day worked.  There is no mention of disability, or decreased functional capacity in these office visit notes.  There was no increase in exams as would be expected if there were increased symptoms and decreased functional capacity.
>
> Based on the medical information provided, there is also no evidence of decreased functional capacity surrounding the date of loss of July 18, 2000.  There is a large gap in medical treatment notes from the Neurologist from February 5, 1999 to January 29, 2002.  There are no treatment notes included in the medical records surrounding the date of loss of July 18, 2000.  Also, surrounding the date of loss, you saw your primary care provider for annual physical exams only.  There was no discussion with your Primary Care Physician regarding filing for disability until the office visit note dated October 19, 2001.

(R. at 00080.)  Thus, in addition to citing late filing and prejudice as warranting denial, Unum also found that Snodgrass' claim lacked support on the merits of his medical evidence.

On appeal, the company again summarized the medical evidence and concluded that "there are no records available for review and comment regarding disease severity and impact on [Snodgrass'] functional capacity around the time that [he] stopped working, or to indicate that [he] was advised by a physician to stop work."  (R. at 00016.)  Thus, Unum concluded, "the available medical records do not substantiate a level of impairment that would preclude [Snodgrass] from performing the duties of [his] occupation as owner/manager as of [his] last day worked of July 17, 2000."  (R. at 00015.)

The Court has reviewed the limited record consisting primarily of the medical evidence summarized above and agrees with Unum that the record supports the reasoned outcome the company reached.  The test is not whether this Court would have reached the same conclusion in evaluating the evidence, but whether the evidence supports the outcome Unum reached.  Here, the medical record, although indeed containing some support for Snodgrass' claim, also contains substantial evidence and inferences that reasonably construed lead to the conclusion that he was not disabled as defined within the short- and long-term disability policies.

This is thus not a matter of Unum advancing "the proposition that an insurer is always entitled to prefer the opinions of its in-house staff to that of a claimant's physicians" as Snodgrass asserts.  (Doc. # 19, at 7.)  Rather, this is a case in which a scant record devoid of much substantive evidence that actually targets the claimant's functioning *during the critical time period at issue* is susceptible of more than one reasonable interpretation–and, in this instance, it is rational to conclude that the medical evidence fails to prove Snodgrass was

10

disabled as of July 2000.[10] Conclusory findings of disability by treating physicians cannot prove dispositive when there is no evidence in the record that these physicians were applying the same definition of disability as contained in the policy language[11] and when the record reflects at best often sporadic visits documenting gradual progression toward increased impairment, with no specific visit or objective substantive data documented in proximity to the actual date of asserted disability.[12]

The February 26, 2004 letter from Dr. David LaHue is a prime example of a flaw in Snodgrass' case. After noting that he had treated Snodgrass for years, Dr. LaHue states on behalf of his patient that "I can assure you that he was indeed disabled prior to the initially listed

---

[10] Unfortunately, there is no question that Snodgrass' condition has continued to deteriorate. As set forth in the record and explained by Snodgrass in his initial brief, motor exam results closest to the claimed disability date indicated scores of 0 to 2, with 0 representing normal and 4 representing the most severe symptoms. By 2002, these scores had deteriorated and continued to do so in subsequent testing that same year. (Doc. # 17, at 11.)

[11] This distinguishes the instant case from a case on which Snodgrass relies, *Heffernan v. Unum Life Insurance Company of America*, 101 Fed. Appx. 99 (6th Cir. 2004.) In *Heffernan*, "[a]ll of the examining and treating doctors found Heffernan to be disabled according to the policy's definition of disability" and "Unum's own examining physician found Heffernan disabled within the meaning of the policy." *Id*. at 108. This is not the case here.

[12] Snodgrass points to the documented observations of Unum's investigator to support his disability claim, while at the same time faulting the scope of that investigation. The interview is of limited weight given that it was conducted well after the claimed date of disability.

The Court also notes Snodgrass' characterization of the investigation. He initially states that the interviewer's "report consists only of what Snodgrass told him. Other than his anecdotal observations, it does not appear that [the interviewer] evaluated Snodgrass's functional capacity in any way." (Doc. # 17, at 7.) Later, however, Snodgrass attacks the interviewer's conclusion that he displayed no memory of cognitive dysfunction by complaining that "it is open to question whether UNUM's investigator was trained to identify memory or cognitive dysfunction." (Doc. # 19, at 2.)

8-00 date. The date of disability was more accurately 12-99." (R. at 00051.) This communication does not, as Dr. LaHue stated he had hoped it would, "shed[] further light as to the onset and progression of [Snodgrass'] medical condition and its relationship to the disability date." (R. at 00051.) Instead, the doctor's conclusory statement asks Unum, and by extension this Court, to take on faith a finding of disability that is not reflected in the reasonably construed objective documentation of Snodgrass' impairment. Although the Court is inclined to regard a treating physician's opinion with due weight, the Court cannot–and Unum is similarly not expected to–accept an unsupported opinion as dispositive in light of ample contradictory or wholly silent documentation.[13] *See Creech*, 2006 WL 41186, at *8 (explaining that a doctor's

---

[13] A reasonable decision-maker could rationally apply this same rationale to qualify the opinion of Dr. Jean Hubble. In a February 4, 2003 letter, Dr. Hubble stated:

> In July of 1999, [Snodgrass] began to notice difficulties in job performance, and the stress he carried as business owner appeared to exacerbated [*sic*] his Parkinson's symptoms.
>
> In my opinion, Mr. Snodgrass was totally disabled prior to the stated date of August 12, 2000, as it was our realization of his disability in late 1999 that caused him to sell the company in June of 2000.
>
> Because Parkinson's disease is a chronic progressive condition, it is always difficult to determine the exact date of total disability. However, based upon medical history and subsequent physical examination findings, we would determine that date to be December 15, 1999.

(R. at 00333.) The continuing problem with such a conclusory opinion is that it directs a decision-maker back to unspecified "medical history and subsequent examination findings," and, reasonably construed, this evidence as set forth in the record fails to support a level of impairment rising to disability. If anything, the silence of the record on this issue is of notable import; it enables a reviewing entity to conclude that the doctors' opinions beg the question: *How specifically did you reach this conclusion when there is no documentation supporting it?* Thus, this case and the opinions of the referenced doctors above are readily distinguishable from those cases in which a treating physician's opinion on disability is supported by objective evidence. *See, e.g., Brooking v. Hartford Life and Acc. Ins. Co.*, No. 04-6478, 2006 WL 357881,

"failure to support his opinion with data or useful analysis is a sufficient reason to discount his opinion, even if he is a treating physician"). The refusal to credit these opinions against the objective record and against the conclusions of Unum's reviewing physician is thus not arbitrary, but a reasoned decision (even if it were not necessarily one that this Court or any other decision-maker might have reached). *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation"); *Evans*, 434 F.3d at 877 (quoting *Black & Decker Disability Plan*, 538 U.S. at 834 ).

Nor can the Court accept Snodgrass' contention that Unum acted arbitrarily and capriciously by ignoring such evidence of disability as the interviewer's citation to two of Snodgrass' former co-workers, who stated that Snodgrass' symptoms of shaking and tremors were readily observable in 2000. (R. at 00322.) But while this contention proves impairment, it does not prove disability; it is not the mere existence of impairment but the degree of impairment that informs the disability determination. The cited statement and similar evidence of some impairment therefore fail to present dispositive evidence that Unum disregarded in making its decision.

Having thus reviewed the quantity and quality of the medical evidence with due skepticism of Unum's decision, the Court cannot say that Unum's denial of benefits was

---

at *4 (6th Cir. 2006) (explaining that doctor's factual account and opinion were "entirely consistent" with objective evidence of a functional capacity evaluation).

13

unreasonable or irrational in light of the plans' provisions. The review afforded Snodgrass' claim was not an insufficient file review that fails to cite the basis for its conclusions or to recognize important evidence. *See, e.g.*, *Calvert*, 409 F.3d at 296-97. Rather, it is essentially the construed medical records of Snodgrass' own doctors, set forth in the limited record, that supports the denial of his claim.

Unum reviewed this evidence, was apparently unable to obtain more complete evidence, and concluded that according to the medical evidence received and its own investigation, Snodgrass was not disabled as defined in the relevant plans. This does not mean that Snodgrass is without credible evidence supporting his claim in the record; his own account of his purported inability to meet his job functions, for example, is notable under a holistic survey of the evidence. But it does mean that there is also sufficient evidence in the record to support the contention that Unum's decision was both reasonable and rational. Accordingly, Unum's denial cannot be regarded as arbitrary and capricious so as to warrant judgment for Snodgrass.

Snodgrass presents a number of additional theories to persuade this Court otherwise. He cites, for example, to a settlement agreement between Unum and various states over claim settlements practices in an effort to indict by inflammatory association Unum's handling of Snodgrass' claim. Such information is not only outside the record, but it is also irrelevant. Whatever Unum's motivation may or may not have been–and whatever its practices in regard to other claims may or may not have been–the medical evidence here reasonably supports the rational outcome the company reached.

This same analysis applies to Snodgrass' invocation of the fact that Unum is apparently a defendant in several class action lawsuits involving alleged securities fraud. The result

14

Snodgrass purports to desire by imparting this information–that the Court shall afford Unum little deference–has little to do with these other cases. Moreover, as noted above, Unum's inherent conflict of interest already qualifies this Court's consideration of the company's decisionmaking.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Snodgrass' motion (Doc. # 17) and **GRANTS** Unum's motion (Doc. # 18). The Clerk is instructed to enter judgment accordingly and terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

  /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE